# Cincinnati, New Orleans & Texas Pacific Railway Company v. Smith & Johnston.

(Decided October 24, 1913).

## Appeal from Boyle Circuit Court.

1.  Carriers—Shipment of Live Stock—When No One Accompanies Stock—Rule as to—Action for Injury to Stock—Burden.—In the shipment of live stock the rule is, that when no one accompanies the stock, the shipper makes out a prima facie case when he shows that the animals were in good condition when delivered to the carrier, and in a damaged or injured condition when delivered by the carrier to the consignee; and thereupon the burden is cast upon the carrier to explain the cause of the injury to the stock, and the carrier can only exempt himself from liability by showing that the injury or death was brought about by the act of God, or because of the inherent nature, propensities, or viciousness of the animals themselves.

2.  Carriers—Shipment of Live Stock—Instructions.—An instruction which attempted to apply the foregoing rule to a shipment of hogs, by directing a verdict for the plaintiff unless the hogs died from some "inherent defect" in said hogs, was erroneous.

3.  Carriers—Shipment of Live Stock—Burden.—Where cattle, unaccompanied by the owner, were shipped over a railroad from Danville, Ky., to Jersey City, N. J., and were unloaded at Cincinnati, Ohio, by the carrier, for rest and food, in compliance with the federal law, they were still in the custody of the carrier, and the burden was upon it to show that an injury to the cattle which first appeared after the cattle had been unloaded and were in the stock pens in Cincinnati, resulted from the inherent nature, propensities or viciousness of the animals carried.

4.  Carriers—Question of Diligence for Jury.—Where the weather was so extremely cold and unusual as to render railroad operations difficult, and the evidence upon the question of the carrier's diligence was conflicting, that question was properly submitted to the jury.

5.  Books—Account Books as Evidence—Entry.—Two of the requisites of admissibility of original entries in account books are, (1) that the entries must be original, and (2) the party who made them must, as a general rule, have had personal knowledge of the facts recorded.

6.  Carriers—Delay in Shipment of Stock—Action for Damages From Delay—Evidence.—In an action by the shipper against a carrier to recover for extra feed bills and loss of weight in cattle shipped by reason of the delay of the carrier, the feed bills and the loss in weight should be proved by the person who fed and weighed the cattle; these facts cannot be proved by a bookkeeper of the Stock Yards Company which caused the cattle to be fed and weighed, the bookkeeper having no personal knowledge of those

facts, or by the bookkeeper of a commission firm which paid the feed bills to the Stock Yards Company, since neither the Stock Yards Company nor the commission firm represented the carrier, or had any dealings with it.

CHARLES H. RODES, NELSON D. RODES and JOHN GALVIN for appellant.

CHARLES C. FOX for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

The appellees, Smith & Johnston, instituted this action to recover $889.59, damages growing out of four different shipments of live stock from Danville, Kentucky, to Cincinnati, Ohio, and one shipment to Jersey City, N. J., on and between October 12th, 1911, and January 30, 1912.

There was a peremptory instruction for the defendant as to the shipment of January 13th, 1912, and the appellees do not complain of that ruling.

A jury trial of the issues relating to the other four shipments resulted in a verdict and judgment in favor of the plaintiffs for $623.61, and from that judgment the defendant appeals.

The appellees are stock traders, engaged in the buying of live stock from the farmers of Boyle and adjacent counties, and shipping the same principally to the Cincinnati market for sale.

As each shipment constituted a separate and distinct transaction, it will be necessary to consider them separately.

1.  On October 12, 1911, appellees bought 118 hogs from four farmers in Boyle County, and drove them to Danville, where they were placed in the stock pens of the appellant the same day. · They were loaded in the live stock freight car between 4 and 5 o'clock in the afternoon. At that time the hogs were all in good condition, and no one representing the appellees attended them upon the journey.  The car reached the Union Stock Yards, in Cincinnati, about 6 o'clock on the morning of October 13th, and was unloaded at 7:30 o'clock, in time for that day's market.  Two of the hogs were found dead in the car.  Their bodies presented no evidence that they had been cut, bruised or injured in any way; the appellant's theory being that some of the other hogs piled upon them and smothered them.  The rule applicable to such cases

in Kentucky is, that when no one accompanies the stock, the shipper makes out a *prima facie* case when he shows that the animals were in good condition when delivered to the carrier, and in a damaged or injured condition when delivered by the carrier to the consignee; and thereupon the burden is cast upon the carrier to explain the cause of the injury to the stock, and the carrier can only exempt himself from liability by showing that the injury or death was brought about by the act of God, or because of the inherent nature, propensities, or viciousness of the animals themselves. L. & N. R. R. Co. v. Pedigo, 129 Ky., 665; I. C. R. R. Co. v. Word, 149 Ky., 229; McCampbell v. L. & N. R. R. Co., 150 Ky., 723.

As no one representing the shipper accompanied the stock in this instance, and the good condition of the hogs was shown at the point of shipment, and the death of two of them at the destination, the only question of fact to be determined by the jury was, whether the death of the two hogs was caused by the inherent nature or some propensity or viciousness of the hogs in the car.

The trial court undertook to submit that question to the jury in instruction No. 1, which reads as follows:

"As to the matters set forth in paragraph 1 of the petition in this case, the court instructs you that unless you believe from the evidence in this case that the two hogs mentioned in said paragraph died from some inherent defect in said hogs, then you will find for the plaintiff, the value of said hogs, not to exceed the sum of $16.31; and unless you so believe, you will find for defendant."

Appellant contends that this instruction told the jury they must believe there was an inherent *"defect"* in the two hogs that died or were killed before they could find a verdict for the defendant, and that the instruction was erroneous in two respects, because it advised the jury that before they could find for the defendant they must find first, the existence of an "inherent defect" in the two hogs admitted to be healthy and sound when shipped; and secondly, that the two hogs must have died from the inherent defect.

It is argued that the instruction is misleading, in that it predicated defendant's right to a verdict upon the absence of defects in the two hogs, when the proof was uncontradicted that all the hogs were healthy and sound. Appellant insists that it never contended that the two hogs which died, caused their own death, but that some of

the other 116 hogs caused their death, and that the jury should have been told to find for appellee, unless they believed from the evidence, that the death of the two hogs was caused by their own inherent nature, propensities or viciousness, or by the inherent nature, propensities, or viciousness of the hogs that were being carried along with the two that died.

In Kentucky the rule in such cases is well established.

In L. & N. R. R. Co. v. Pedigo, 129 Ky., 666, we said:

"So in Kentucky the rule is, at the common law, that a railroad company or other common carrier undertaking to transport live stock becomes an insurer of its safe delivery, except where injury to or the loss of such live stock results from the act of God or the public enemy, or from the inherent nature, propensities, or viciousness of the animals themselves."

Southern Express Co. v. Fox & Logan, 131 Ky., 265; B. & O. S. W. R. R. Co. v. Clift, 142 Ky., 575; I. C. R. R. Co. v. Word, 149 Ky., 229; McCampbell v. L. & N. R. R. Co., 150 Ky., 723, are to the same effect.

Attention has been called to the fact that in I. C. R. R. Co. v. Word, 149 Ky., 229, we used the general expression, "inherent vice" of the animal in stating the rule of the Pedigo case, and that the Word case is a departure from the rule as announced in the Pedigo, and similar cases. No such purpose, however, was intended, as will be seen from a careful reading of the opinion in the Word case. The words "inherent vice," as applied to animals, was there used as a short equivalent for their inherent nature, propensities, or viciousness; it was not used to indicate or embrace a defect unaccompanied by the inherent nature, propensity, or viciousness of the animals.

The first instruction above set forth was misleading, and did not correctly give the law as embodied in the cases above cited. Instead of predicating the appellant's non-liability upon the fact that the two hogs "died from some inherent defect in said two hogs," they should have been instructed to find for the plaintiff unless they believed from the evidence that the death of the two hogs resulted from their own inherent nature, propensities, or viciousness, or from the inherent nature, propensities, or viciousness of the other hogs that were being carried with them in the car.

The giving of instruction No. 1 was error, and upon a retrial of the case, if the evidence be the same, the

instruction under this paragraph should be along the lines above indicated.

2.   The second shipment consisted of 52 head of cattle, and was made on November 20, 1911.   The cattle were driven from the country to Danville, arriving there a little before noon of that day, when they were placed in appellant's stock pens.   About 3 o'clock that afternoon, Johnston and Kimberlain loaded the cattle in two ordinary live stock freight cars, and consigned them to Jersey City, N. J.   An hour later the stock left Danville for Cincinnati, and arrived at the Union Stock Yards at 8 o'clock a. m. the next morning, where they were unloaded and fed.   The cattle were in good condition when they were loaded at Danville, but after they had been unloaded, and while they were in the pens of the Union Stock Yards in Cincinnati, either on the day of their arrival, or the next day, Kaus, the salesman for J. P. Sadler & Co., a commission firm, discovered that two of the cattle were "down;" were badly bruised, and greatly depleted in flesh.   He removed the two injured cattle, and sold them at $3.50 per hundred pounds.   Kaus testified that if those cattle had been in first class condition they would have brought $6.00 per hundred pounds, and gave it as his opinion that the cattle were bruised by being tramped upon by other cattle.

Another witness, Schneider, says one of the herd was unable to walk to the pen upon its arrival in Cincinnati.

As no one representing the shipper accompanied the cattle, this case comes within the rule heretofore laid down, which throws upon the carrier the burden of explaining the cause of the injury, and holds it liable, unless it can show that the injury was due to the inherent nature or some propensity or viciousness of the animals carried.   Appellant did not satisfy this requirement by its proof.   It offered no evidence upon this point.

It insists, however, that it was entitled to a peremptory instruction because the plaintiff's proof did not show that the cattle were injured when they reached the stock yards in Cincinnati, but that the evidence only showed the injury at a later time, and when the cattle were in the pens of the Union Stock Yards.   The court declined to give the peremptory instruction, and instructed the jury along the lines indicated in the Pedigo case.

Appellant's motion for a peremptory instruction was properly overruled, since the cattle were in appellant's

custody and control, en route to Jersey City, N. J., and had been unloaded at the Union Stock Yards in Cincinnati, by the appellant, for the purpose of resting and feeding them, as is required by law. The cattle had not left appellant's custody; and, that being true, the question of appellant's liability was properly submitted by the instruction given.

3. On January 16, 1912, the appellees shipped 57 head of cattle in two cars, over appellant's road from Danville to Cincinnati. They had been driven to the appellant's stock pens, arriving there a little after one o'clock p. m. on the 16th. On the day before appellees had notified the appellant's agent at Danville that they would need two stock cars on the 16th. Appellant's agent, Caughlin, testified that he did everything within his power throughout the morning of the 16th to get the two cars placed in front of the cattle chute for the appellees, but on account of the extremely cold and unusual weather conditions then prevailing, the engines and cars froze and the work of operation was reduced almost to standstill. Train No. 62 was a live stock train, made up at Danville, and was scheduled to leave that point at 3 o'clock p. m. On this day it left Danville at 4:20 p. m. Up to the time of its departure, appellant's trainmen had not placed the cars at the chute to receive appellees' cattle; and consequently they did not get their stock started on that train. If the shipment had gone forward by train No. 62, it would, under ordinary conditions, have reached Cincinnati on the morning of the 17th, in time for that day's market.

The next northbound live stock train was No. 52, which originated at Chattanooga, Tenn., where it received cars of live stock from other southern railroads. This train arrived at Danville at 11:40 p. m. on the night of January 16th, and did not leave Danville for Cincinnati until 4 o'clock the next morning. The two cars had not been placed so as to receive appellees' shipment of cattle until 7 p. m. of the 16th, and they were loaded about an hour later, although Johnston testifies that he was ready to load them as early as one o'clock of that afternoon. These two cars containing appellees' stock were placed in train No. 52, which left Danville at 4 o'clock on the morning of the 17th, as above stated. It is contended by appellant that the run from Danville to Cincinnati, ordinarily about nine hours, was greatly retarded by reason of the unusually cold weather, and that the train

did not reach Erlanger, Ky., a station six miles south of Cincinnati, until 8 o'clock in the evening of the 17th. At that point appellant unloaded appellees' cattle, in order to comply with the Federal statute, which forbids the keeping of live stock on a car more than 28 hours without rest, water and feed. The cattle were reloaded at 8 o'clock on the morning of the 18th, and carried as far as Ludlow, Ky., where the bridge crew took the cars across the Ohio River and delivered them to the B. & O. Ry. Co., and that company carried the cars to the Union Stock yards in Cincinnati, arriving there at 3.20 p. m. on the 18th. The two cars were unloaded by an employee of the Union Stock Yards Company, whose duty it was to look over the shipment on its arrival. He did not notice any bruises or injuries to the stock. On the next day Kaus, a salesman for Sadler & Co., the commission firm to which the stock had been consigned, saw the cattle and noticed that they were in a gaunt and tired condition. One car load was sold on January 22nd, and the other on January 25th.

This shipment presents two questions: (a) that of appellant's diligence in handling its cars and trains, and (b) the recovery for the extra feed bills, and for the loss in the weight of the cattle.

(a) As their cause of action upon this shipment, appellees alleged that through appellant's failure to use ordinary care and diligence in the handling of the cars, the cattle did not reach the stock yards in time for the market of January 17th as they should have done, and in consequence of their delayed arrival, they were gaunt and worn in appearance, had lost weight, and could not be sold for several days after their arrival; that appellees were compelled to pay extra feed bills, and that if the cattle had arrived on time for the market of January 17th, they would have weighed much more, and would have brought more money than they did when sold on January 22nd and 25th.

Appellant admits that it owed appellees the legal duty to use ordinary care, under the circumstances, to carry the cattle to their destination within a reasonable time; but it denied that the failure of the cattle to arrive in Cincinnati in time for the market of January 17th was a failure to exercise ordinary care or diligence, under the circumstances attending the shipment. Appellant insists that since the appellees' claim for damages in this instance grows out of the alleged delay in carrying the

cattle from Danville to Cincinnati, the burden of proof throughout is upon the appellees to make out their case, and that they have failed to sustain that burden. Appellees show, however, that they had requested the cars to be furnished them in ample time, and that their cattle were ready for loading as early as one o'clock p. m. on January 16th, and that if they had been able to then load their cattle they could have been carried to Cincinnati by train No. 62, which left Danville at 4:20 o'clock p. m. of that day, instead of 4 o'clock a. m. of the next day—a delay of about 12 hours.

Appellant admits, for the sake of argument, that there was sufficient evidence to carry the case to the jury upon the question of appellant's fault in not getting appellees stock on train No. 62, but insists that there is not a scintilla of proof to show that if the stock had been put on this train, they would or could have reached Cincinnati in time for the market of January 17th. This contention is based upon the abnormal weather conditions, which the record tends to show were so severe as to greatly hamper all railroad operations. That question, however, was presented to the jury by the eighth instruction, which was given upon the motion of the appellant, and reads as follows:

"The court instructs the jury, that if they believe from the evidence, that on the 16th and 17th days of January, 1912, that the weather was so unusually cold and severe as to prevent the defendant company, by the use of ordinary care, to move trains in the ordinary course of business, and that by reason of such climatic conditions, the defendant, by the use of ordinary care, was unable to get the two car loads of cattle in the shipment of January 16, 1912, to Cincinnati in time for the cattle market on the 17th day of January, 1912, then the jury will find for the defendant as to the claim of the plaintiff of $536.80, damages on the shipment of January 16, 1912."

By this instruction appellant obtained all it asked, and cannot now complain that the jury found the facts against it, respecting its diligence in handling its cars and train.

(b) Did appellees sustain their claim, by competent evidence, for extra feed bills, and losses in the weight of the cattle?

The items of alleged loss upon this shipment, are as follows:

(a)   Market loss, 50 cents per hundred pounds ......$293.60
(b)   Loss on account of extra shrinkage .................. 130.00
(c)   Extra feed bills; that is, feed bills beyond
 what they would have been had the cattle been
 handled with ordinary care and diligence ........ 113.00

   Total loss on this shipment ...........................$536.60
 The manner of feeding stock after it arrived at the
stock yards was as follows: Whenever feed was to be fur-
nished, an employee of the Stock Yards Company would
feed the hay and corn to the stock, and this employee who
did the feeding would note on a ticket the amount of feed
thus furnished, and would deliver the ticket to the book-
keeper of the Stock Yards Company. This bookkeeper
would make out an account on blanks, in triplicate,
against the commission firm which had the stock for
sale. The original would be retained by the Stock Yards
Company; the duplicate and triplicate would be
delivered to the commission firm for payment,
the duplicate to be paid and retained by the
commission firm, and the triplicate to be given
by it to the shipping customer of the commission
firm. The bookkeeper of the commission firm would
then enter this bill on its books as a charge against the
shipper, and include the charge in its account of sales to
the shipper. This course was followed in this case.
Henry See weighed and fed the cattle; but to prove those
facts appellees took the deposition of Eversman, the
bookkeeper of Sadler & Co., the commission firm which
held the cattle for sale, and also the deposition of Dill-
man, the bookkeeper of the Stock Yards Company. These
witnesses proved what they had done in making the
entries as above indicated. Appellant excepted to all the
questions asked Eversman and Dillman, which dealt with
the feed bill, and weight of the cattle, but the court over-
ruled the exceptions. Appellant insists that the testi-
mony of Eversman and Dillman was not competent to
prove the facts relating to the feeding of the cattle, and
their weight, and that those facts could be proved only
by the man who fed and weighed the cattle.
 The testimony of See, which was the best evidence
upon the subject, was not offered. It is objected that the
testimony of Eversman and Dillman was hearsay; that
it was not competent as an admission, because it was
not a statement made by a party to the suit, nor against
the interest of the party making it; that it is not the

declaration of a deceased person against his interest, and that it is not an entry in a party's books of account. To show that it is not such an entry, it is pointed out that there was no entry on an account book at all, since Dillman merely made out a statement on blank forms, retaining one copy, and delivering the other two to the commission firm, Sadler & Co., in this case, which firm made an entry on its account book. It is insisted that the purport of this entry upon the account book of Sadler & Co. was that Dillman told Eversman that some one had reported to Dillman that the cattle had been fed a certain amount of provender, and that this was hearsay upon hearsay.

It is further insisted that the shop-book rule does not apply, because the entry was made upon the book of Sadler & Co., who had not sold anything to the appellees, thus making it the converse of a case where the shop-book rule would apply; and that the shop-book rule applies only in suits between shopmen and the purchaser, and not, as in this case, where the purchaser sues a third party. Appellant would apply the same rule to the evidence offered as to the weight of the cattle in Cincinnati, which had been shipped on January 16th, and contends that as Henry See weighed the cattle, and presumably kept a record thereof, he alone was competent to prove those facts.

Appellees insist, however, that the testimony of Eversman and Dillman was competent as showing original entries, under subsection 6 of section 606 of the Civil Code of Practice, which provides that "a person may testify for himself as to the correctness of original entries made by him against persons * * * in an accounting, according to the usual course of business." This refers to entries as to dealings between litigants, and not to entries made by a third party of a transaction, with which the defendant had no connection. Moreover, two of the requisites of admissibility of original entries in account books are, (1) that the entries must be original, and (2) the party who made them must, as a general rule, have had personal knowledge of the facts recorded. In Estes v. Jackson, 21 Ky. L. R., 859, 53 S. W., 271, entries in a ledger that were taken from a journal or day book, were held not to be original entries. Moreover, these entries were made by Dillman without any personal knowledge of the facts. He merely acted upon what See told him. Again, Dillman acted for the Union Stock Yards Co.,

which had no dealings with appellees in this connection. Dillman made no entry against appellees; his charge was against Sadler & Co., who paid the bill, and charged it, in turn, to appellees. The appellant had no dealings with either the Stock Yards Company or with Sadler & Co., in these matters.

We conclude that the evidence of Eversman and Dillman was not competent against the appellant, either as to the feed bill, or the weight of the cattle. The cattle had been fed and weighed by Sea, and his testimony, therefore, would have been the best primary evidence of those facts. The statements made out by Dillman, and the charge made therefrom by Eversman upon the books of Sadler & Co., were in no way competent against the railroad company, which had no dealings with either of them. B. & O. S. W. R. R. Co. v. Clift, 142 Ky., 577.

The admission of this testimony was error.

4. On January 30, 1912, appellees shipped a car loaded with 21 cattle, 45 hogs, 7 calves, and one sheep, from Danville to Cincinnati. On the 29th appellees had notified appellant that they wished a live stock car for the 30th. At 2:30 p. m. on the 30th a live stock car was placed for appellees at the chute of the stock pens. This was in time for the appellees to load their stock for train No. 62, which was scheduled to leave Danville at 3 o'clock p. m., but which did not leave Danville on that day until 4:20 p. m. Appellant's witness says appellees were compelled to build partitions in the car to separate the stock, and for that reason did not get it loaded before 5 o'clock p. m.; while appellees' witness says the stock was loaded by 2:30 p. m. If the stock was loaded by 2:30 p. m., it could have been carried to Cincinnati by train No. 62, which left at 4:20 p. m., and could have reached Cincinnati the next morning in time for that day's market; but if the loading was not completed until 5 o'clock, the car would, as it did, have to wait for train No. 52 from Chattanooga, which left Danville, on this occasion, at 11:40 p. m.

After train No. 52 had gone 15 miles from Danville, it was delayed two hours by a derailed car in front of it. This took train No. 52 off its schedule, and it was compelled to avoid many regular passenger trains on its way to Cincinnati. It did not arrive at Ludlow, Ky., until 11:55 a. m. on the 31st; it was then carried across the Ohio River to Cincinnati, and turned over to the B. & O. Ry. Co., which carried the car to the Union Stock

Yards, reaching there at 3.05 p. m. On the next day Kaus, the salesman for Sadler & Co., saw the stock, and testified that three of the herd were in bad condition. One was "down" and badly bruised, and was sold for $6.00; the others were also badly bruised, and sold for greatly reduced prices.

The gravamen of this paragraph is, that the car did not arrive in Cincinnati in time for the market of January 31st, on account of the negligence and delay of the appellant, and that they had been damaged in the aggregate sum of $219.92 by reason of a decline in the prices on the Cincinnati live stock market; by the payment of extra feed bills which they had to pay; by extra shrinkage in the weight the stock, and by injuries thereto.

Appellant assigns two reasons for a reversal as to this shipment, (1) that the court erred in submitting to the jury the question of its negligence in failing to deliver the stock in Cincinnati in time for the market of January 31st; and (2) that the court further erred in submitting the question of the decline of prices in the Cincinnati cattle between January 31st and February 3rd.

Appellant further insists it was entitle to a peremptory instruction because the uncontradicted testimony showed that appellant used all possible diligence, under the circumstances, in delivering this shipment, and that there is no evidence showing there was a decline in the cattle market between January 31st and February 3, 1912.

Appellant, however, is mistaken in assuming that the testimony is uncontradicted as to the controlling fact of the loading of the cars. It is true, appellant's local agent says appellees did not get the car loaded before 5 o'clock; but appellees say they had it loaded by 2:30 p. m., which was in time for train No. 62, which left Danville at 4:20 p. m. The question of diligence, was, therefore, properly submitted to the jury.

Upon the question of the condition of the Cincinnati stock market on January 31st, appellant relies upon the testimony of Kaus, who says there was no decline in the cattle market between January 31st and February 3rd, and that, according to his recollection, the market was steady during that entire period.

This, however, is not the only testimony upon this subject. Sadler, a Cincinnati live stock commission merchant, testified that if the hogs "had arrived in time for

the market of January 31st, the light hogs would undoubtedly have brought ten cents a hundred more.''

Furthermore, Lutes, a salesman for Sadler & Co., is equally explicit in saying that the five calves would have brought a dollar a hundred more, and would have weighed more, on January 31st than they did when they were finally sold.

The testimony being conflicting upon these issues, the court properly submitted their determination to the jury.

For the errors indicated, however, the judgment of the circuit court is reversed, and the cause remanded for a new trial.